UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

NORA L. F.[1]                                     )
                                                  )
                    Plaintiff,                    )
                                                  )
vs.                                               )          Case No. 3:20-cv-01084-GCS[2]
                                                  )
COMMISSIONER OF SOCIAL                            )
SECURITY,                                         )
                                                  )
                    Defendant.

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff filed for DIB in 2018, alleging a disability beginning on November 21, 2016. (Tr. 15). However, Plaintiff's claim was unsuccessful, both initially and on reconsideration. *Id*. The Administrative Law Judge ("ALJ") held a hearing on Plaintiff's case on October 17, 2019. *Id*. On November 19, 2019, the ALJ denied Plaintiff's claim. *Id*.

---

[1]     In keeping with the court's usual practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]     This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 13).

The Appeals Council denied Plaintiff's request for review on August 13, 2020, making the ALJ's decision the final decision of the Commissioner. (Tr. 3).

### ISSUES RAISED BY PLAINTIFF[3]

Plaintiff raises the following issues:

1.) The ALJ's residual functional capacity ("RFC") assessment did not comport with Social Security Ruling ("SSR") 96-8p's "narrative discussion" requirement;

2.) The ALJ failed to properly consider Plaintiff's need to be off-task;

3.) The ALJ's mental RFC is not supported by substantial evidence;

4.) The ALJ's symptom evaluation is not supported by substantial evidence.

### APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of

---

[3]     As the Court finds that remand is appropriate on issue (1), it does not address the other outstanding issues in this case. As such, the Court finds that issues (2), (3) and (4) are moot.

specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his or her former occupation? and (5) Is the plaintiff unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *See Burmester*

*v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. First, the ALJ noted that Plaintiff has not engaged in substantial gainful activity since her onset date in 2016. (Tr. 17). The ALJ then found that Plaintiff had the following severe impairments: lumbosacral degenerative disc disease and spondylosis; left-shoulder pain; irritable bowel syndrome ("IBS"); restless leg syndrome; migraine headaches; unspecified depressive disorder; mood disorder; unspecified anxiety disorder; history of attention deficit hyperactivity disorder ("ADHD"); and post-traumatic stress disorder ("PTSD"). *Id*. These impairments significantly limited Plaintiff in her ability to perform basic work activities. (Tr. 18). Though the ALJ noted that Plaintiff also carried diagnoses of seborrheic dermatitis and hemorrhoids, he found that these impairments did not more than minimally impact Plaintiff's ability to engage in basic work-related activities. *Id*.

Although Plaintiff suffered from severe impairments, the ALJ determined that these impairments and the combination of impairments did not meet or medically equal the severity of those impairments listed in 20 C.F.R. § 404. (Tr. 18). The ALJ first found that Plaintiff's degenerative disc disease did not satisfy the severity requirements of 1.04 because Plaintiff does not have evidence of nerve root compression or the requisite neurological deficits. *Id*. However, the ALJ noted that Plaintiff estimated she could stand for thirty minutes and sit for only twenty minutes. (Tr. 21). She also stated that she could

walk for only one block before needing rest. *Id*. Plaintiff also mentioned that her IBS became exacerbated with stress and anxiety. (Tr. 21). The ALJ, however, found that Plaintiff's IBS did not meet the criteria listing of 5.06 because the medical evidence did not contain documentation of the required diagnostic techniques and because Plaintiff had not experienced the requisite obstruction of stenotic areas or other listed symptoms of IBS. (Tr. 18). Nevertheless, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not consistent with the medical and other evidence in the record. (Tr. 21).

The ALJ paid particular attention to the consultative examination of Adrian Feinerman, M.D. on November 13, 2018. (Tr. 21). Plaintiff reported to Dr. Feinerman that she experienced lower-back pain caused by a cyst. *Id*. She also reported a longstanding history of IBS symptoms. (Tr. 22). Though Plaintiff did have a positive straight-leg test on the right leg, Dr. Feinerman found no other clinical signs of these impairments and found no anatomic deformity in Plaintiff's spine. *Id*. However, because Dr. Feinerman did not assess Plaintiff's limitations in a function-by-function manner, the ALJ found that her report was too broad to be persuasive. (Tr. 24-25). Similarly, the ALJ did not find persuasive the opinions of the State Agency Medical Consultants ("SAMC"). (Tr. 24). Since the last date of review by the SAMCs, on March 25, 2019, Plaintiff submitted additional medical evidence. *Id*. The ALJ found that this medical evidence supported imposing more stringent restrictions on Plaintiff than the SAMCs recommended. *Id*.

The ALJ did rely on medical evidence post-dating Plaintiff's consultation with Dr. Feinerman. Later x-rays and radiological studies in December 2018, as well as a motor

nerve conduction study performed in February 2019, confirmed that Plaintiff did not have anatomic deformities in her spine. (Tr. 18). The ALJ also noted that Plaintiff underwent a colonoscopy in December 2018, which yielded normal initial impressions. (Tr. 23). An abdominal ultrasound further supported this finding. *Id.*

After considering Plaintiff's physical ailments, the ALJ turned to Plaintiff's mental impairments. (Tr. 18). The ALJ noted that Plaintiff must demonstrate at least one extreme or two marked limitations in a broad area of function, including: "understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." *Id.* A claimant demonstrates a marked limitation when they are unable to function in an area independently, appropriately, or effectively on a sustained basis. *Id.* An extreme limitation is the inability to function independently, appropriately, or effectively in the area. *Id.* The ALJ found that Plaintiff had a mild limitation in understanding, remembering, or applying information. *Id.* Though Plaintiff struggled with reading comprehension and experienced memory lapses, she also exhibited an ability to ask and answer questions during treatment. *Id.*

The ALJ determined that Plaintiff had a moderate limitation in interacting with others. (Tr. 19). Plaintiff had contact with one of her sons, and lived with her husband, grandchild, and stepdaughter. *Id.* However, contact with crowds caused Plaintiff to panic. *Id.* Plaintiff also isolated herself due to her depression. *Id.*

In concentration, persistence, and maintaining pace ("CPP"), the ALJ found that Plaintiff had a moderate limitation. (Tr. 19). Plaintiff had racing thoughts and poor concentration, making it difficult for her to finish a project. *Id.* However, the ALJ also

considered that Plaintiff could concentrate well enough to use a computer and a cell phone, and that Plaintiff displayed no abnormal speech or thought processes consistent with disabling distractibility. *Id*. The ALJ further noted that various examiners found that Plaintiff had a demonstrated ability to maintain conversational exchanges. *Id*.

The ALJ found that Plaintiff had only a mild limitation in adapting or managing oneself. (Tr. 19). Although Plaintiff was occasionally bed ridden due to her psychological impairments, she also stated in her testimony that she was capable of cleaning, doing laundry, and grocery shopping. *Id*. Furthermore, though Plaintiff stated she did not drive due to panic attacks, the ALJ found that she drove, shopped for groceries, managed her finances, used a computer, and watched television. *Id*.

When considering Plaintiff's mental impairments, the ALJ found the assessments of the State Agency Psychological Consultants ("SAPCs") persuasive. (Tr. 19). The ALJ considered that the SAPCs found mild restrictions in understanding, remembering, and applying information and moderate restrictions in interacting and relating with others, CCP, and adapting or managing oneself. *Id*. These opinions comported with the available medical evidence. *Id*. Specifically, the ALJ noted that Plaintiff experienced substantial improvement in her ability to remember when she used prescribed psychotropic medications; however, the record also raised doubts as to how often she would take those medications. (Tr. 23). Furthermore, when Plaintiff did experience symptoms, these symptoms coincided with "fleeting stressors." (Tr. 24). A clinician described Plaintiff's depression as "situational," and the ALJ found that description appropriate. *Id*. Moreover, the ALJ noted that Plaintiff admitted cleaning, doing laundry, grocery

shopping, and traveling. (Tr. 25). Accordingly, the ALJ found that Plaintiff's depression symptoms were not indicative of her baseline functioning. (Tr. 24).

The ALJ found that neither the third-party reports of Plaintiff's husband and stepson, nor the opinion of Plaintiff's primary care physician to be persuasive. (Tr. 25). Plaintiff's husband, Randall Freeman, stated that Plaintiff's daily activities were limited and that she was often overwhelmed by house-hold chores. *Id*. He also stated that she struggled with managing her finances. *Id*. However, the ALJ noted that Plaintiff was able to conduct her daily activities and that she only conservatively managed her symptoms. *Id*. The ALJ found that this contradicted both Mr. Freeman's reports and the conclusion from Plaintiff's primary care physician that Plaintiff was disabled. *Id.*

After careful consideration of the record, the ALJ found that Plaintiff had the RFC to perform sedentary work, except for the following physical restrictions:

> She can lift/carry 10 pounds occasionally and less than 10 pounds frequently. She can sit for at least six hours and stand/walk for about two hours out of an eight-hour workday. She can occasionally push/pull and operate foot/leg controls with the right-lower extremity. She can never climb ladders, ropes or scaffolds but can occasionally climb ramps or stairs. She can occasionally stoop, kneel crouch, and crawl. She can perform no overhead reaching with the non-dominant left-upper extremity. She must avoid concentrated exposure to extreme cold, loud noise, vibration, and dangerous workplace hazards, such as exposed moving machinery and unprotected heights. She must work in an environment with a moderate noise intensity level of quieter as defined within the Selected Characteristics of Operations (SCO), examples of which include the noise associated with light traffic or the noise found in a grocery store or department store.

(Tr. 20). The ALJ also considered Plaintiff's mental RFC, and limited her to the following:

> She can understand and remember simple instructions and carry out simple, routine and rote tasks that require little independent judgment or decision-making. She should work in a stable work setting in which there is little change in terms of tools used, the processes employed, or the setting itself, and change, when

necessary, is introduced gradually. She can occasionally interact with coworkers and supervisors. She should not have any job related public interaction.

(Tr. 20).

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.

**1.      Evidentiary Hearing**

Plaintiff was represented by an attorney during the October 17, 2019 hearing on her disability claim. (Tr. 35). Although Plaintiff was unemployed at the time of the hearing, she testified that she performed a variety of jobs, including housecleaning and work as a dietary aid, from 2002 to 2015. (Tr. 39-45). Plaintiff explained that her most recent job ended in 2015 when the woman she was caring for died. (Tr. 39).

When asked about her current capabilities, Plaintiff explained that she had significant difficulties driving. (Tr. 47). Traffic triggered panic attacks for Plaintiff; in turn, the anxiety associated with the panic attacks would trigger her IBS symptoms. *Id.* If Plaintiff drove ten or fifteen miles from her home, she would have to pull over to use the restroom, and her back would start to hurt. (Tr. 47-48). However, Plaintiff also stated that she would travel that distance to attend her doctors' appointments. (Tr. 48).

Plaintiff also testified that she experienced panic attacks for approximately five years, though the attacks worsened when her son died in August 2017. (Tr. 49). Being in crowds would trigger the panic attacks, as would visiting her doctor in Anna, Illinois, where her son was murdered. (Tr. 49-50). However, Plaintiff testified that she preferred

to remain with her current doctor than search for a doctor in a different city. (Tr. 50). During her panic attacks, Plaintiff's heart would begin to race, and her IBS symptoms would become exacerbated. (Tr. 50). Plaintiff testified that she also took Xanax every day in order to manage her panic attacks and used breathing exercises when she experienced an attack. (Tr. 51).

Plaintiff characterized her depression as feeling "always sad." (Tr. 51). On certain days, Plaintiff would stay in bed; during those periods, she found it difficult to get dressed or to shower. (Tr. 52). Plaintiff saw both a psychiatrist and psychologist for treatment of her depression. *Id*. Plaintiff also began taking Prozac for her depression. (Tr 53). Though she originally tried Lexapro, this medication did not work to treat Plaintiff's depression. *Id*.

When the ALJ inquired into Plaintiff's mental health further, Plaintiff explained that she often experienced hallucinations of her deceased son. (Tr. 54). Though Plaintiff initially characterized her son's death as a murder, she also explained that he died from a fentanyl overdose. *Id*. Plaintiff's PTSD symptoms worsened after her son died, though she experienced the symptoms prior to her son's death, as well. (Tr. 55). Plaintiff explained that despite these symptoms, she would go to the grocery store with her husband late at night, when the store was less likely to be crowded. (Tr. 57). However, she was not able to go to church due to her fear of crowds. *Id*.

Plaintiff explained that when she tried to sleep, she would have racing thoughts. (Tr. 58). She also stated that when she started a project, she was often not able to finish it. *Id*. Overall, Plaintiff claimed she had no ability to concentrate. *Id*.

When asked about her physical limitations, Plaintiff asserted that she had severe back problems, including a burning sensation in her right legs. (Tr. 59). Plaintiff took Mobic for her nerve symptoms; however, she stated that the medication did not work. (Tr. 60). She also took daily medication to treat her IBS symptoms. *Id.* However, she testified that despite this medication, she would experience symptoms four days per week and three times per day. (Tr. 62). Overall, Plaintiff stated that her back pain limited her to standing comfortably for only about twenty or thirty minutes and sitting about fifteen or twenty minutes. (Tr. 63). Plaintiff, however, did not use an ambulatory device for walking. *Id.*

On a good day, Plaintiff testified that she would have a little bit to eat before the food interfered with her IBS. (Tr. 64). She would then watch television and talk with her daughter or husband. When her back began to hurt, she would straighten up the counters or floors in her residence. (Tr. 64-65). However, because her medication makes her groggy, she would often sleep for an hour before getting up and watching television again. (Tr. 65). Although she enjoyed reading, she was not able to comprehend written books, and so she often listened to audio books. *Id.* On a bad day, Plaintiff explained her pain would make it impossible for her to leave the bed. *Id.* Plaintiff estimated that she had approximately four bad days per week. (Tr. 66).

Vocational expert ("VE") Dr. Jackie Rogers first indicated that none of Plaintiff's past work would be available to her if Plaintiff were limited to:

> . . . a sedentary exertional range of work activity defined as lifting and carrying ten pounds occasionally, less than ten pounds frequently; sitting for at least six out of eight hours; standing and walking for about two out of eight hours . . . occasionally

using the right lower extremity for pushing, pulling and operating foot or leg controls . . . never climb ladders, ropes, or scaffolding but can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl . . . should not perform any overhead reaching with the non-dominant left upper extremity . . . avoid concentrated exposure to extreme cold, loud noise, vibration, and dangerous workplace hazards such as exposed machinery and unprotected heights . . . work in an environment with a moderate noise intensity level or quieter as that's defined within the selected characteristics of occupations . . . limited to understanding and remembering simple instructions and carrying out simple routine and rope tight tasks that require the use of little independent judgement or decision-making . . . work in a stable setting . . . [with] little daily variation in terms of tools used, processes employed, the setting itself, and change, when it is necessary, it's introduced gradually . . . [and] occasionally interact with others, including public coworkers and supervisors . . .

(Tr. 72-73). However, Dr. Rogers also found that Plaintiff could perform other jobs with these restrictions. (Tr. 73). When the ALJ asked whether jobs existed for Plaintiff if he changed the hypothetical to include no public interaction, Dr. Rogers confirmed that the same jobs still existed for Plaintiff. (Tr. 74). The ALJ also asked a third hypothetical, restricting Plaintiff to:

. . . being off-task in [her] ability to compete job-related duties . . . about twenty percent of the workday in addition to normal breaks, so that would equate to . . . about a day a week, or about two and a half hours a day, that they would be unable to focus or concentrate on job tasks, [and] would have to be away from the workstation.

(Tr. 74). Dr. Rogers estimated that this limitation would eliminate all jobs available to Plaintiff. (Tr. 75).

## 2.    Medical Records

According to the available record, Plaintiff first saw her primary care physician, Dr. Katrina Tripp, on March 16, 2016. (Tr. 436). During this visit, Dr. Tripp found that Plaintiff had increased anxiety which interfered with her ability to complete household

chores and to sleep. *Id*. However, the context of these symptoms included major life stressors; Plaintiff explained that she was under a lot of stress due to potentially serious legal issues stemming from a fight with her ex-husband. *Id*. Plaintiff's prescribed medications included Adderall, Alendronate, Ambien, Effexor, Naprosyn, Neurontin, Pravastatin, Topamax, Wellbutrin, Xanax, and Zithromax; however, Plaintiff told Dr. Tripp that she stopped taking Wellbutrin because she was feeling better. (Tr. 434, 437).

Plaintiff next saw Dr. Tripp on September 21, 2016. (Tr. 429). At that time, Dr. Tripp found that Plaintiff experienced increased anxiety and panic symptoms. (Tr. 430). However, these symptoms again occurred in the context of major life stressors and family problems. *Id*. Specifically, Plaintiff reported that she found drug paraphernalia, methamphetamine, and heroin in her son's room and had recently kicked him out of the house. *Id*.

On December 20, 2016, Dr. Tripp recorded that Plaintiff's symptoms had improved. (Tr. 425). Dr. Tripp found that Plaintiff suffered from chronic recurrent major depressive disorder, for which she was prescribed a continued dose of Wellbutrin; ADHD, for which she was prescribed Adderall; anxiety, for which she was prescribed Xanax; and PTSD, for which she was prescribed Prazosin. (Tr. 429). Plaintiff reported that the medications were helpful, though she still experienced significant family stressors. *Id*.

Plaintiff did not see Dr. Tripp again until June 27, 2017. (Tr. 419). During that visit, Plaintiff had increased anxiety in the context of major life problems and family stressors. (Tr. 421). Plaintiff stated that her Xanax was not helping, but the other medications were helping to manage her symptoms. (Tr. 422). At the time of this visit, Plaintiff had allowed

her son to live with her again after he completed residential treatment for his drug addictions. *Id*.

Two months later, on August 28, 2017, Plaintiff saw Dr. Tripp again. (Tr. 417). Plaintiff's son had died from a drug overdose prior to this visit. *Id*. Dr. Tripp noted that Plaintiff had increased anxiety and panic symptoms. *Id*. Although Plaintiff's worsening symptoms occurred in the context of bereavement, she also stated that she knew her son's death was not her fault and that she was doing "fairly well." (Tr. 418). Plaintiff also stated that she had not been using Ambien because the Prazosin was helping her sleep. *Id*.

On December 4, 2017, Dr. Tripp found that Plaintiff again exhibited increased anxiety and panic symptoms. (Tr. 415). Plaintiff explained that she was having difficulty dealing with her son's death. *Id*. This difficulty caused depression and a lack of motivation. *Id*.

Plaintiff next saw Dr. Tripp on January 11, 2018. (Tr. 409). During this visit, Plaintiff reported increased anxiety and panic symptoms. (Tr. 411). Plaintiff told Dr. Tripp that she wanted to "cut back" on her use of Xanax because it made her more agitated. *Id*. She also began attending group therapy for families of drug addicts, which helped her to handle her son's death. *Id*.

On May 5, 2018, Dr. Tripp noted that Plaintiff's anxiety, depression, and panic symptoms had worsened and that these symptoms interfered with Plaintiff's ability to conduct household activities and sleep. (Tr. 408). However, Dr. Tripp noted that Plaintiff's symptoms occurred in the context of major life stressors, family problems, and bereavement. *Id*. At the time of her visit, Dr. Tripp had prescribed Plaintiff Adderall,

Alendronate, Lexapro, Naprosyn, Pravastatin, Ranitidine, Wellbutrin, Xanax, and Zithromax. (Tr. 406-407). Dr. Tripp's notes also referred to Plaintiff's use of Restoril for sleep; however, as of May 5, 2018, Plaintiff reported she was not using that medication. (Tr. 408). At the end of her patient-visit summary, Dr. Tripp concluded: "[b]ased on the patients [sic] current assessment and history, I do not believe the patient will be able to sustain a long term gainful employment and I did encourage the patient to pursue disability due to the nature of her illness." *Id*. Plaintiff continued to see Dr. Tripp throughout 2019; during this time, she continued to report increased anxiety and panic symptoms in the context of major life stressors. (Tr. 525).

Plaintiff also saw Dr. Emily D. Hanson of Southern Illinois Healthcare for treatment of her physical symptoms. On July 21, 2017, Dr. Hanson noted that Plaintiff had recurrent, intermittent abdominal pain. (Tr. 470). The abdominal pain included vomiting but did not include other gastrointestinal symptoms. *Id*. Dr. Hanson did not find tenderness or other signs of a mass in Plaintiff's abdominal examination. (Tr. 471). During the visit, Dr. Hanson diagnosed Plaintiff with IBS. *Id*.

On August 10, 2018, Dr. Hanson noted that Plaintiff continued to suffer from IBS; she also reported hip pain. (Tr. 473). This pain continued to worsen, and on August 29, 2018, Plaintiff told Dr. Hanson that the pain also extended to her lower back and right leg. (Tr. 475). During this visit, Plaintiff additionally reported that her IBS symptoms had become worse. *Id*. On September 11, 2018, Dr. Hanson noted that Plaintiff's IBS symptoms had become worse after she lost her son. (Tr. 538). By this date, Plaintiff suffered from fecal urgency and incontinence with increased stress; sometimes she suffered

incontinence without warning. *Id*.

Adrian Feinerman, M.D., conducted a consultative examination of Plaintiff on November 13, 2018. (Tr. 546). Dr. Feinerman did not note any musculoskeletal or spinal abnormalities and found that Plaintiff could ambulate fifty feet without an assistive device. (Tr. 551). Although Plaintiff had a positive straight leg test result on the right leg, Dr. Feinerman did not note other neurological abnormalities in Plaintiff. (Tr. 552).

Plaintiff saw Mack E. McCain, M.D., for a colonoscopy on December 6, 2018. (Tr. 561). Dr. McCain found evidence of stage one internal hemorrhoids. (Tr. 561). Plaintiff's colonoscopy results were otherwise normal. *Id*. Plaintiff saw Dr. McCain again on March 19, 2019. (Tr. 851). Dr. McCain noted that Plaintiff had abdominal pain and bloating; Dr. McCain scheduled a May 6, 2019 endoscopy for Plaintiff to investigate the cause of her symptoms. (Tr. 855). The endoscopy returned normal esophageal and duodenum results, with mild antral gastritis. (Tr. 870).

Plaintiff also attended physical therapy throughout 2018 to address her back pain. (Tr. 608). On October 16, 2018, Polly Sinha, PT, noted that Plaintiff's myotomal testing was negative for lumbar nerve impingement and that her symptoms and function were expected to improve with physical therapy interventions. (Tr. 610). However, during her October 28, 2018 visit, Plaintiff stated that she experienced pain while doing her physical therapy and continued to have pain for about thirty minutes after completing her exercises. (Tr. 621). She also reported that she was no longer taking Robaxin because she believed it was causing her to clench her teeth. *Id*. By December 4, 2018, Plaintiff stopped her physical therapy because she believed it made her back pain worse. (Tr. 627).

Nevertheless, on the same day, Nurse Practitioner Cori A. Starkweather confirmed that Plaintiff had a positive straight leg test on the right leg only. (Tr. 629). She also had a decrease over the medial, anterior and lateral thigh, calf and dorsal aspect of her right foot when conducting a sensory examination. (Tr. 629). On January 15, 2019, Plaintiff reported to Nurse Starkweather that her back pain had become worse. (Tr. 659). She also reported that she was no longer taking the prescribed Neurontin or Lyrica because she could not tolerate them. (Tr. 659).

Plaintiff additionally reported back pain during this time to Dr. Gerson Criste, M.D. (Tr. 878). Dr. Criste noted on February 12, 2019 that Plaintiff's conservative treatment options had failed her and that an epidural steroid injection would be the next reasonable option for treatment. (Tr. 881). However, Plaintiff's back pain continued to worsen throughout 2019. (Tr. 889). On April 1, 2019, Dr. Criste preformed an L5 transforaminal epidural steroid injection under fluoroscopy and found that Plaintiff had an L5 lumbar radiculopathy. (Tr. 894). He also conducted medial branch nerve blocks of Plaintiff's L45 and L5S1 facet joints under fluoroscopy on June 3, 2019; during this procedure, Dr. Criste determined that Plaintiff had lumbosacral spondylosis without myelopathy. (Tr. 898).

For treatment of her mental health, Plaintiff attended psychiatric therapy at Union County Counseling Services, Inc. (Tr. 715). During her October 3, 2018 intake examination, the attending therapist found that Plaintiff demonstrated a moderate risk of harm to herself or others. *Id*. Plaintiff reported that she had a history of depression, anxiety, and anger control problems. (Tr. 721). The therapist also noted that Plaintiff

suffered from PTSD and ADHD. (Tr. 726). Plaintiff's attending therapist noted on October 31, 2018, that she responded well to Cognitive-Behavioral Therapy ("CBT"). (Tr. 713). This progress continued throughout 2018 and early 2019. (Tr. 709, 711).

      **3.**      **The State Agency Consultant's Review**

      SAMC Lenore Gonzalez, M.D., examined Plaintiff on November 28, 2018. (Tr. 92). Dr. Gonzalez found that Plaintiff could lift no more than fifty pounds occasionally and twenty-five pounds frequently. (Tr. 87). Furthermore, Dr. Gonzalez found that Plaintiff could stand or walk for approximately six hours out of an eight-hour workday. *Id.* Dr. Gonzalez further noted that no current medical evidence supported finding neuropathy. (Tr. 88).

      When conducting Plaintiff's mental examination, M.W. DiFonso, Psy.D. noted that Plaintiff was moderately limited in her ability to understand and remember detailed instructions. (Tr. 89). Moreover, Dr. DiFonso noted moderate limitations in Plaintiff's ability to carry out detailed instructions and to maintain attention and concentration for extended periods. *Id.* Finally, Dr. DiFonso determined that Plaintiff had moderate limitations in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 89-90). Overall, Dr. DiFonso found that Plaintiff's cognitive skills were sufficient for simple one and two-step tasks, as well as less detailed multi-step tasks with modified social demands. (Tr. 90).

      SAPC Howard Tin, Psy.D., conducted an examination of Plaintiff on March 18, 2019. (Tr. 119). Dr. Tin determined that Plaintiff had medically determinable impairments

including recurrent depression, ADHD, anxiety, and PTSD. *Id*. Dr. Tin found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions. (Tr. 124). He also determined that Plaintiff was limited in her CPP, including: the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods. *Id*. Finally, Dr. Tin noted that Plaintiff was moderately limited in her ability to interact appropriately with the general public. *Id*. Overall, Dr. Tin found that Plaintiff could perform one and two-step tasks.

### ANALYSIS

Plaintiff first asserts that the ALJ's RFC was not supported by substantial evidence because the ALJ failed to provide a proper narrative discussion considering the medical facts and non-medical evidence behind his assessment. (Doc. 23, p. 3-4). The ALJ must build "an accurate and logical bridge from the evidence to [his] conclusions." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must support this discussion with citation to specific medical facts and non-medical evidence. *Id*. Furthermore, the ALJ has "a duty" to fully develop the record and articulate his or her reasoning prior to drawing conclusions. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). In doing so, the ALJ must "at least minimally articulate" the analysis of the evidence "with enough detail and clarity to permit meaningful appellate review." *Hickey v. Berryhill*, No. 16 CV 2337, 2017 WL 5001417, at *2 (N.D Ill. Nov. 2, 2017)(citing *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)). This articulation assists both the applicant and later courts of appeal in understanding the decision, because without an adequate explanation, "neither the

applicant nor subsequent reviewers will have a fair sense" of how the ALJ weighed the evidence that was presented. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Accordingly, SSR 98-6p requires that the RFC assessment include a narrative discussion describing how the evidence supports each conclusion. *See* SSR 96-8p, at *7. When crafting this discussion, the ALJ "must not substitute his own judgment for a physician's opinion without relying on medical evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see also Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Simply summarizing the medical evidence in the record is therefore insufficient for meeting this standard. *See Perry v. Colvin*, 945 F.Supp.2d 949, 965 (N.D. Ill. 2013); *see also Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

Plaintiff points out that the ALJ in this case discounted the SACs' opinions that Plaintiff could perform light work with postural and environmental limitations because more recent evidence justified imposing more stringent limitations on Plaintiff. (Doc. 23, p. 3). Though the ALJ weighed the SACs' opinions, according to Plaintiff, he crafted an RFC that did not fully consider evidence demonstrating Plaintiff's inability to sit or stand for prolonged periods of time, including her testimony and medical records demonstrating pain in her legs and hips. *Id*. at p. 5-6. Plaintiff also argues that the ALJ's determination that the record supported greater limitations than those recommended by the SACs was based on his own layperson assessment of the medical evidence. *Id*. at p. 6.

Defendant points out that the ALJ explicitly discussed his reasoning, citing to medical evidence of Plaintiff's back and leg pain, shoulder pain, and migraines. (Doc. 28,

p. 6). The ALJ also recognized Plaintiff's IBS symptoms, though he considered contrary colonoscopy findings when crafting the RFC. *Id*. at p. 4. Defendant also argues that the ALJ found that the medical evidence supported the decision to impose stricter limitations on Plaintiff than those the SACs recommended, citing to *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). *Id*. at p. 5. However, the Court does not find this line of reasoning persuasive. In *Burmester*, the Court considered whether the ALJ's use of "boiler-plate" language indicated an untailored RFC regarding the plaintiff's CPP and found that imposing stricter limitations revealed the ALJ's consideration of the plaintiff's disabilities. 920 F.3d at 510. As the Court did not consider whether the ALJ properly explained his RFC in narrative form, this case is not applicable to this issue.[4]

Although the ALJ cited to considerable medical evidence in the record, he failed to fully consider evidence that did not favor his RFC. For example, the ALJ determined that Plaintiff could sit for six hours and walk for two hours. (Tr. 21). The ALJ noted that Plaintiff testified that she could sit for only twenty minutes, and stand for thirty minutes, before needing a rest. (Tr. 21). The ALJ also noted that the medical evidence was not consistent with Plaintiff's reports. Specifically, he noted that radiological studies revealed no abnormalities which would justify such a severe limitation. (Tr. 22). But, the ALJ failed

---

[4]      Defendant also cites to *Palmer v. Saul*, No. 19-1079, 779 Fed. Appx. 394, 398 (7th Cir. Aug. 23, 2019) and *Dudley v. Berryhill*, No. 18-1629, 773 Fed. Appx. 838, 842 (7th Cir. May 16, 2019) to argue that Plaintiff cannot show harm where an RFC is more restrictive than the SAMCs' opinions. (Doc. 28, p. 8). In the former case, the Court noted that the plaintiff failed to explain how the more restrictive RFC was an error. *See Palmer*, 779 Fed. Appx. at 398. In the latter case, the Court noted that the plaintiff failed to include any limitations the ALJ should have included. *See Dudley*, 773 Fed. Appx. at 842. In contrast, here, Plaintiff is explicit that the ALJ should have included stricter limitations accounting for her need to rest after sitting and standing, her need to be off-task, and other CPP considerations. *See generally*, (Doc. 23). These cases are therefore inapposite.

to account for the contrary findings of the SACs which did not support his findings. The ALJ also noted that Plaintiff underwent an initially conservative course of treatment culminating in epidural injections and that she was able to conduct limited daily tasks. *Id*. However, the ALJ failed to explain how this initially conservative course of treatment supported his RFC, particularly as Plaintiff's treatment increased in intensity throughout 2019. Furthermore, the ALJ also did not consider the medical evidence that Plaintiff suffered from lumbosacral radiculopathy and lumbosacral spondylosis as of 2019. (Tr. 898). Without proper explanation of his consideration of this evidence, the ALJ rejected both Plaintiff's account of her limitations and the SACs' contrary opinions. Lastly, though the ALJ noted that Plaintiff conducted some daily tasks, he failed to consider "*how* [she] carried out [daily living] activities." *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). Though the ALJ is not required to rely on a particular physician's opinion or to choose between the competing opinions of a plaintiff's physicians, *see Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007), he must nevertheless explain which evidence he weighed in crafting his RFC. He must also explain why he discarded the evidence he chose to weigh less heavily.

Defendant further argues that Plaintiff failed to demonstrate how the evidence she cites would result in a more restrictive RFC. (Doc. 28, p. 7). However, this standard omits the Court's mandate to remand the ALJ's decision when that decision is insufficiently clear. When deciding an appeal of a decision to deny SSI benefits, an ALJ must adequately articulate his or her analysis so that others can follow the reasoning employed. *See*

*Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). This articulation assists both the applicant and later courts of appeal in understanding the decision, because without an adequate explanation, "neither the applicant nor subsequent reviewers will have a fair sense" of how the ALJ weighed the evidence that was presented. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Here, the ALJ rejected both Plaintiff's account of his limitations and the state psychological reviewers' contrary opinions. He provided no support for his eventual finding by demonstrating what evidence he *did* rely on when arriving at his RFC. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted). Accordingly, remand is required in this case, and Plaintiff's remaining issues are hereby MOOT.

This Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

### CONCLUSION

The Commissioner's final decision denying Plaintiff's application for disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

DATE: March 28, 2022.

Digitally signed by
Judge Sison 2
Date: 2022.03.28
13:42:19 -05'00'

_____

**GILBERT C. SISON**
**United States Magistrate Judge**